本当はこの時ている Thank you. ほんとうはこの時ている Good morning. May it please the court. Maryland provides meaningful access to voting to voters with disabilities. And the record demonstrates its continuing commitment to improving that access. Maryland fully complies with all federal accessibility standards for its voting systems. Its polling places, over 99% of its polling places are fully accessible, barrier-free on election day. Maryland provides early voting for eight days before election day at over 60 early voting centers. The early voting centers are fully accessible, and its voting systems comply with all accessibility standards. Why isn't the context here accessibility to the program that you chose to make available, and that is absentee voting? Why isn't that our context? Well, Your Honor, all of the cases that have examined the American Disabilities Act in Section 504 in the context of voting have examined an entity or state or a city's entire program of voting, with primary focus, of course, on election day. And then subsidiary focus on the alternative methods of casting a vote that will be counted as the result of election day. Here, the district court focused on Maryland's system of voting in the context of its paper absentee balloting system. And it is a paper system, Your Honor. I understand. And my question is, why was that not correct? Why was that not an appropriate focus? Well, all of the cases have focused on the entire program. In other words, the services voting, in other words, it's the ability to cast a vote and have it counted. And there's just alternative ways of achieving that goal. And that's what all the cases focus on. It's the ability to cast a vote and have it counted. And I guess my answer has to be that this is just an alternative way of doing that. It's not a separate service or program. But even if it were, even if you were going to consider it separately, you have to focus on, I think, the nature of the service that's offered. And it is a paper ballot. It's read into an optical scan voting system. No matter how the voter fills out the form, it has to be printed and mailed in. Once it gets to the state board or the local boards, it has to be transferred to the proper kind of card and fed into a scan machine. And so even if you're considering the service absentee voting, it is a paper system. And so the question would then be, I suppose, how do you make this paper ballot accessible? The plaintiffs relied on the Paulson case, which of course was the case involving the US currency, which is a paper currency. And the request there was that the United States accommodate visually impaired citizens, or rather consumers, people using money to be able to use the paper money by making it accessible tactically so that you could distinguish between denominations. And that was the accommodation requested. And if you analogize that here, what you'd really be requesting is an accessible paper ballot. And that could be accommodated with an accessible PDF. All of the individual plaintiffs testified they would be able to fill out such a form on their computer. That is not what's been requested here, however. What was requested here was a lot more than that. It's cutting edge online technology, internet-based, that communicates the vote to the server and then generates a voted ballot, which is then sent to the state board. And so very reasonably, in light of all the security concerns that were expressed to both the legislature and the state board over the use of such technology in an election, the legislature required that it be certified as secure, private, and reliable, and that it would protect the integrity of an election. Such requirements are fundamental to the states in protecting the security of their elections and reliability, especially after the experience in 2000. The record shows that certification requirements are very important. There's federal testing of voting systems, that all that was adopted in light of the 2000 experience. And so the record here was replete. If you look at the legislative history, which is in the joint appendix, you'll see the record's replete with warnings from nationally recognized experts that there were certain vulnerabilities inherent in having a system that communicates over the internet. And very reasonably, the Maryland legislature adopted a procedure that requires the state board to be satisfied that the adoption of any new voting technology protects the security, privacy, reliability, and integrity of the election. And that's fundamental to voting systems. And to states, they have a compelling interest in protecting the security of their systems. I don't know, have I addressed the, no? I'm sorry, Your Honor. Let me go back to where I started, and I was probably just unclear. The statutes prohibit disability discrimination with respect to programs. Yes, Your Honor. And I could certainly see your argument that voting, that you make voting writ large available in an accessible format. But it also applies to services. And what I'm trying to understand is, going back to the analytical inception, why absentee voting isn't a service that once you decide to make it available, you must also make available, because you didn't have to. But once you decide to make it available as a service, why doesn't it have to be fully accessible as well? Well, I'm not, certainly not arguing that absentee voting does not have to meet accessibility standards, Your Honor. But what I'm pointing out is that all of the cases that have analyzed voting have not. But you're skipping past my question. My question, I don't disagree with you. It is, you're probably, I'm sure you're correct. But my question to you is, regardless of what has been the focus of all of the cases, analytically, with the starting point of the statute, once a state decides to provide a service within the broader context of a voting program, why do not the requirements of accessibility attach to the service? Well, they do, Your Honor. I'm not saying that they don't. Maryland meets the accessibility requirements for absentee balloting that are set forth in the Voting Rights Act. What the Voting Rights Act provides for with respect to absentee ballots is that the state must permit a visually impaired voter to have third-party assistance. And we've cited that in our brief, that provision of the Voting Rights Act. And Maryland law complies with that. Section 9308 of the election article provides for that. And I also, as I also was saying, that since it is a paper absentee ballot, the focus would, once we get past that step and saying, well, you have to make your paper accessible, as in the Paulson case, then you have to focus on, well, how do you make paper accessible? And the most common way to make paper accessible is either tactically, which wouldn't really work here. In fact, the Technical Assistance Manual of the Department of Justice says that braille ballots should not be provided because it can lead to a segregated ballot. So the other alternative would be an accessible PDF. That's what's commonly done in order to make paper accessible. That was not requested here. In fact, there was really no request made to the state board. The lawsuit was filed demanding that the online tool be provided. There was no prior request for an accessible paper ballot. That's never been a subject of discussion as far as the record shows. What we have is the lawsuit asking for the online ballot marking technology, which is a lot more than an accessible paper ballot. The record shows that the experience is like voting at a touch, sort of, at the touchscreen electronic machines where it's a ballot wizard. In other words, you get a series of screens that walk you through the ballot. You make the choices. At the end, you get a summary screen. It warns of undervotes. It prevents overvotes. It's not like filling out a PDF form on a computer. It's a lot more than that. It interacts with the state board servers. It produces a voted ballot that the voter prints. It has the barcode with the voter's choices encapsulated in the barcode, which then when it gets back is mailed to the state board and it's turned into an optical scan ballot. It's visually inspected by a bipartisan team to make sure it matches the voter's choices and then it's fed into the machine. It's a lot different than just an accessible paper ballot. While it didn't fall within the Maryland's definition of voting system as the attorney general opinion explains that's cited in our brief, which gives the whole background of the development of the ballot marking wizard, mentions that ballots could be filled in with a PDF annotator as an alternative to the wizard. But it's a lot more than that. And given all the security concerns that were expressed and given the experience with all the daily news of hacking into government systems, the Maryland legislature determined that it would require certification of the safety of the system before it could be deployed in an election. But what's at play here is, I understand Maryland wants to have a holistic approach to your voting apparatus. But the United States and the other parties think that it should be a much more narrow view and they base that on the text of the ADA to include exclusion from participation in the public program. And so if we read that text as, as it's written, then you've got a problem, don't you? Well, no, Your Honor, because again, you have to look at the nature of the accommodations requested, is it reasonable? And here we have, I've been talking about two different possible accommodations. One is an accessible PDF. Well, it was reasonable two years ago, and now it's unreasonable. You had this program in, I don't remember the exact date, and then it got changed. I understand about all the arguments about fraud, but you all said in some of these voting rights cases, ask the question, how much fraud is it really out there? But nevertheless, it's the text that locks us in, in a case like this. Well, I think the focus here seems to be on the communications regulation, providing services in an accessible format. And again, the Justice Department has never, before the filing of this brief, as far as I'm aware, taken the view that absentee ballots have to be filled in by online technology. The notice of proposed rulemaking said that the department did not intend to require every entity covered by Title II to provide every device or all new technology, as long as what was provided enabled communication. And as I said, an accessible PDF would do that without running afoul of Maryland certification requirement and involving new internet technologies, which I think everyone agreed exposed voting systems to danger from malefactors. The evidence of trial shows that. I mean, the plaintiff's evidence, the plaintiff's own evidence showed that there were security issues. The district judge found that there were security issues. And it does really fundamentally alter the nature of voting certification, to instead of, you know, the state board is supposed to certify it is secure. And instead, the district judge expected the state board to come in and prove that it wasn't, or else it would have to provide the service. And, you know, no state voting systems and the federal systems aren't set up that way. And I'd suggest that the Justice Department's interpretation is not entitled to any hour deference in this case. This is, you know, previously unannounced interpretation of this communications regulation as it applies to absentee balloting. There's never been a hint that just simply complying with the Voting Rights Act requirement of third party assistance wouldn't satisfy accessibility standards. And the notice of proposed rulemaking didn't mention, it was not a hint that it would apply to elections or to election technology. Maryland complies with all voting accessibility standards for election technology, set under every federal statute. And so to now announce in this case that Maryland is guilty of discrimination, given the record in this case and the accessibility of Maryland's systems is, you know, an unfair application of the regulation. Thank you. Thank you. Ms. Weber. Thank you. Good morning, Your Honors, and may it please the court. There are three primary reasons why the district court correctly ordered the Board of Elections to make the ballot marking tool available to the plaintiffs in this case. First, in the absence of the tool, plaintiffs are denied an equal opportunity to participate in absentee voting because they can't do so privately and independently, just like every other Maryland voter. Second, there exists an auxiliary aid, here the ballot marking tool, that affords plaintiffs in this case and other voters who are blind or have dexterity impairments that prevent them from independently marking a paper absentee ballot, it affords them that equal opportunity to participate. And so third, the board must make the tool available because it has not met its burden of showing, much less it hasn't even argued that making the tool available poses an undue burden or otherwise fundamentally alters the voting program itself. Oh, I'm sorry. I thought it did argue that it fundamentally, although the focus is different. And one of the difficulties I've had with the arguments is the extent to which they sometimes seem to miss each other. And what I understood Maryland to be saying in that regard is that denying or usurping the function of the certification board does fundamentally alter the nature of the voting process. And did I misunderstand that? They do make a fundamental alteration argument. However, their fundamental alteration argument, as you noticed, applies to a decision-making process and approval process that relates to the voting program, but they're not actually arguing that making the tool available fundamentally alters the voting program itself. Okay, so why is their characterization of that not correct in your view? Sure, well, the fundamental alteration defense that appears in the regulations for Title II speaks of fundamental alteration to the nature of the program service activity, not to a decision-making process that somehow relates to the program. And there's good reason for that, because if Title II, if it was a fundamental alteration to usurp a decision-making process, that would eviscerate Title II of the ADA because every public entity would create some kind of decision-making committee, decision-making process for deciding when laws or regulations apply and when exceptions should be made for people with disabilities. And that would thwart the entire purpose of Title II of the ADA. And it's worth noting that the fundamental alteration cases the board relies upon, not one of them deals with a fundamental alteration to a decision-making process. All of those cases deal with some fundamental alteration to the program itself. So for example, in Mary Jo See, the Second Circuit case involving filing deadlines for disability retirement programs. In that case, the court considered the purpose of the filing deadline and ultimately held it wouldn't fundamentally alter the program for that deadline to be extended in the case of someone with a disability. It wasn't considering, is there a committee that makes the decision about a filing deadline and should we bypass the power of that committee to make a decision regardless of how the outcome comes out? And it's also worth noting that here, the Board of Elections voted three to one in favor of certifying this tool. Because- Right, and it just, it failed to achieve the super majority because of an absent. Well, because one member voted no and one member was absent, exactly. And so taken to its logical conclusion, the board's argument here is that the existence of someone's federal civil right can hinge on the decision of one appointed political committee member to either vote no or not to show up for a vote. And that can't be the case. Again, that would eviscerate Title II of the ADA. I want to go back to the denial that, why currently plaintiffs are without, or without the tool, plaintiffs are without an equal opportunity to participate in absentee voting. And Judge Duncan, as you pointed out, whether you think of it as a program or a service, clearly the ADA requires accessible absentee voting when it's possible to do. And here, we heard a lot of talk from my colleague about how do you make a paper absentee ballot accessible? That seems really hard. Well, in this case, it's not hard. The board developed technology to do exactly that. The board invented this ballot marking tool. There's no dispute that it makes the ballot accessible. It makes absentee voting accessible for people who can't independently mark paper ballots. And that it works. And so because of that, the Effective Communication Regulation 35 CFR.160 requires that the board make this tool available unless it can show undue burden or fundamental alteration, which it has not done. So you don't dispute the fact that a state would have legitimate security concerns about an interactive program of this nature? A state could, but that's not the case here. And in fact, sort of where my question was going, if you don't mind, whose burden, who has the burden on that point in your view? The state does here, because that goes to their fundamental alteration defense. And Judge Bennett below gave the state ample opportunity to present evidence, asked the state to put on evidence to support all this rhetoric about the need to protect the security and the integrity of the election. Invited the state to put on these experts it's talking about, present their opinions before the court. And it failed to do so. It did not present a scintilla of evidence below showing any security threat by using the tool, nor has it challenged the district court's findings that the tool on the issue of security, that it doesn't pose a real security threat to the integrity of the election. And so even if we get to the purpose of the certification law about preserving the integrity of the election, this defense just ends up being empty. It's a red herring here. And I also want to be clear. So it's true that many of the other voting cases, all the other voting cases, none of them deals with absentee voting. I believe we're the first. However, those cases are completely applicable here because what they tell us is that the ADA doesn't require mere access. It's not about just having your vote counted under whatever means are available. The how, the equal opportunity to cast your vote is really important. So for example, in the Carrigan Gate case out of the Eastern District of Pennsylvania, in that case, the plaintiffs had a bevy of ways to vote. However, many plaintiffs couldn't access their local polling facilities because they weren't physically accessible for wheelchairs. And the court there held, even though those individuals could have their votes counted some way, somehow, there were real benefits to voting at your local polling place. They got to see their neighbors, talk to representatives of people on the ballot outside, and that created, that was an important part of the voting program. And similarly here, absentee voting, not only is it, must there be equal opportunity because it's a service available to everyone, but particularly for many individuals with disabilities, the ability to vote at any time, from any place, from the comfort of your own home, not to have to worry about transportation to the polls. But that argument casts too broad a net, doesn't it? Because the state didn't have to make That's correct, so right, if the state had no absentee voting program, this would be a somewhat different case, but not completely, because it's important to keep in mind that there are individuals like Plaintiff Janice Toothman, who are deaf and blind, and currently have no method for voting privately and independently anyway, through any system. Well, I hope that's not your argument. That's not our primary argument, but it's something that I wanna just make sure the court has in the back of its mind. But the ability to access absentee voting is critical, because it's a program service available to everyone. And it also sends an important message, because the state makes absentee voting available, in addition to other methods, in order to make it as easy as possible for people to exercise. I just wanna make sure that you're not arguing that a state has an ADA obligation to make absentee voting available as a system. No, but it does have an obligation to provide deaf blind people, if there's an auxiliary aid that exists, that would enable them to be able to vote privately and independently. They must make that available. And if they have an absentee voting program, that program must be accessible as well. But if they don't have a program, you're right, it's a different, that would be a very different case. One thing I wanna note, because the board relied on many decisions, discussing that there's no right to private and independent voting. And all of these cases predate, there's a 2011 amendment to the effective communication regulation. And this regulation, again, says that if an auxiliary aid provides an equal opportunity for effective communication, it must be provided. And in 2011, the Department of Justice clarified this regulation to state that to be effective, the auxiliary aid must protect the privacy and independence of the individual with a disability. And so any doubt that existed before 2011 as to whether private and independent, having a secret ballot was a really important part of what it means to vote. And that if there were an aid that provided that opportunity, that it had to be made available. Well, the district court ultimately bottomed this decision on the general anti-discrimination regulations as opposed to the effective communication. You stand by that? Yeah, so either way, the district court's opinion should be affirmed because either this is a reasonable modification of the state certification law, it's reasonable because the tool exists, there are no problems with it, it's been used in the past in different versions, or it needs to be made available as an auxiliary aid. So under either, there are two ways of getting at the same idea, but with the ultimate idea being that plaintiffs in this case and other voters with disabilities need to have an equal opportunity to participate in absentee voting. But you would agree that the district court's decision, the basis of this decision, is a safer route? I take note, it's another route, they're two equally valid routes as far as I see. Isn't there danger in going the other way that it's too absolute and it will give much broader relief than is necessary? Under either method, obviously, we'd be fine to have the district court's opinion affirmed under either the effective communication regulation or reasonable modification. I do think analytically, the effective communication regulation is more on point because what we're talking about here is an auxiliary aid, is a tool. And when that tool is available and it ensures equally effective communication, the state must make it available unless they can prove fundamental alteration or undue burden. It just fits the facts here well. But it fits just as well to talk about reasonable modification. And so if the court would like to affirm on that basis, that's absolutely fine. I'm not saying affirm is undue. Sure. Sure. I want to also just briefly touch upon, we heard a little bit about the HAVA and the Voting Rights Act, and that the state's following those laws. Well, two points on that. The Help America Vote Act, HAVA, which deals with what kind of technology is used in voting locations, has a savings clause which says explicitly that nothing in the Help America Vote Act affects in any way people's rights under the ADA. And secondly, the Voting Rights Act, which talks about being able to, that it's okay to have someone assist you vote, that actually, that provision predates the ADA. And so again, it's just not applicable in this case. Okay. I also want to note, because we heard a little bit about, had the plaintiffs just asked for an accessible PDF or Braille ballot that might have been different. This is the first I've heard the state talking about an accessible PDF ballot. It was never mentioned as an alternative. And here, where there exists an aid that was already paid for, it was ready to go, there's just no reason, the fact that there might be other possible modifications or tools available that we haven't even tried out or we don't know if it would really work, doesn't negate their obligation to provide the requested auxiliary aid minus a fundamental alteration. If there are no other questions, I'll conclude. Because the ballot marking tool is an auxiliary aid that provides individuals with disabilities an equal opportunity to vote privately and independently by absentee ballot, the district court correctly ordered the board here to make it available. And thus, the district court's opinion should be affirmed. Thank you. Thank you. Mr. Chandler. Good morning, your honors. May it please the court, Tom Chandler for the United States as amicus supporting plaintiff's appellees. We agree with the district court and of course largely with the plaintiffs that the district court's ultimate conclusion is correct. And we agree there's a Title II violation here under either the effective communication regulation or the reasonable modification regulation. But we believe, if we've set forth in our brief, that plaintiff's claims, that persons with vision disabilities seeking equal opportunity to vote absentee are most appropriately analyzed under the effective communication regulation. I know Judge Floyd raised this very issue. The effective communication regulation is separate and apart from the reasonable modification provision. They're in separate subparts of the regulations. The regulations have various subparts that apply more specifically in different circumstances. They're separate paths to a violation of Title II. So yes, this court could affirm on either basis, but we believe, as plaintiff just noted, that the effective communication regulation is particularly on point here. It speaks to the use of accessible electronic and information technology. That's part of what an auxiliary aid is. And that's what the marking tool is here. Speaks to the use of those things to ensure that people with vision disabilities have access to communication and can communicate with public entities privately and independently. And that is the thrust of this case. And it's important, this case, because use of the tool here as an auxiliary aid in the context of communication overrides the presumption that persons with disabilities need assistance. And that goes to the central purpose of the ADA when it was enacted in 1990. Well, it seems, the reason I ask that question, it seems somewhat awkward to me to conceptualize that absentee voting primarily is a means of communication between Maryland citizens and its public officials. Well, there's a communication element here, and defendants acknowledge that in their reply brief. Obviously, the persons with the blind need to be able to understand what the state is telling them on the ballot and need to be able to communicate their vote or their selections back to the state. It centrally goes to communication, and under the effective communication reg, it says the public entity shall furnish auxiliary aids to ensure effective communication, and further says that those auxiliary aids shall provide, or must provide, the ability to get the benefit privately and independently. And that's what goes to the heart of this case, and that's why it's a direct fit. There are different versions. Isn't Maryland Council of Maryland saying it has to be an auxiliary aid, which auxiliary means in its Latin form, to help, to assist, but I think Maryland's position in which we respond to this is that they have decided in their process of certification that a paper ballot is the platform by which they can comply with that certification. That's their paper, and therefore they would say that their position is that the auxiliary assistance is the auxiliary assistance in accessing paper ballots, but not that they have to move that to another level in terms of, I mean, that's their position, so in auxiliaries to help you, you get to decide what the platform has to be to an auxiliary, or just auxiliary to what the platform has to be. Well, auxiliary aids are defined to include, there are all sorts of things, you know, interpreters, and here. Sure, exactly, interpreters don't change the platform. Interpreters help you communicate with the platform. Right, but their argument ignores the facts of this case, and cases arise in particular contexts. This case arises in the context of the plaintiff's group. They allow anyone to vote by absentee. Maryland developed this online ballot marking tool. They made it accessible. They had it tested, and the testing company said it was secure. They had that test audited. It didn't take any issues with it. There was testimony at trial that it was secure, that it was accessible, that it allowed private and independent voting. They've used it successfully. They have it, they've developed it, they've used it, it works. So under the regulations. Well, but that's, they have, there have been, the question is, who gets to determine what's the best auxiliary aid? Right, they've regulated it. I'm sorry. And that is why, that raises an issue that we don't have to grapple with if we go with the reasonable accommodation analysis that the district court employed. Right, but. I understand that you think it's preferable because it's. Well, we just urged the court. It provides more benefits, but it also raises the specter of questions that we may not have to grapple with if we were to take different routes. Right, at the end of the day, the answer is the same. You know, the agency that enforces Title II and Title III and drafts the regs, you know, we do have an interest in some analytical clarity. This Prekel versus Indiana 2015 district court case, California Council of the Blind, those are the two cases that have addressed both regs and said you should look at it under the effective communication reg if it involves communication, and that's what we urge here. And we also urge that you can go lockstep through the effective communication reg each step of the way, and it fits here perfectly. There is this auxiliary rate. Plaintiffs want to use it. You should give primary consideration to their choice. It will provide for privacy and independence. I see my time. There needs to be an absolute approach to it as opposed to allowing the state of Maryland to have some. Well, the regulation addresses that again. It says specifically that you should give primary consideration to the choice of the plaintiff because the plaintiffs are gonna know better what type of auxiliary aid will best suit them, but they don't have to do that if they can show there's an alternative way, an alternative auxiliary aid, but in any event, they have to allow for privacy and independence, and that's the core here, and that's what plaintiffs are being denied. And so you can't, defendants, I think, in large part, argument just ignores the effect of communication regulation altogether and says there's a lot of ways to vote. It's as if the only thing that matters in this case is that you get to vote and you get to have your vote counted, and that's not what matters here. That's not the benefit that they're trying to get. They want to equally be able to vote privately and independently like everybody else can when Maryland makes this available to everybody else, and that's what they're denied, and that's why, I see I'm over my time, but just to wrap up, this case under the ADA in its own unique way is terribly important because it implicates the intersection of ensuring individual independence, and that goes to the core of the ADA, to not have to rely on other people to access state benefits, and also implicates the use of new technologies, and the ADA contemplates and specifically says that there's gonna be the development of new technologies. We're not trying to lock in things, but as these new technologies get developed, they should be relied upon to allow the person with disabilities to be independent, and that's what happened here, and that's what the tool does, and Maryland developed it. It works. Fact findings are in favor of the plaintiff. It is secure. It offers them what they want. The court should affirm, the court can affirm on either basis. We just offer up our explanation as to why we think that effective communication is the better fit, but certainly the court should affirm on either basis. Thank you very much. Thank you. Mr. Bernhardt, you have some time reserved. Ms. Bernhardt, it seems like you like what Tennessee Williams said through his character in The Glass Menagerie, blow out your candles or the world is lit by lightning.  and now you wanna go back to the candle. No, Your Honor, not at all. Well, is it correct that you didn't put all the evidence about all these horribles or horribles as to security breaches and those kinds of things or expert testimony? Was that, was your counsel wrong when she said that you didn't make that case that you seem to be arguing here now rather pacifist? No, Your Honor. The point I was trying to make was that no court has ever held that certification requirements are not fundamental for elections and that they should be waived and that there was ample evidence in the legislative record which was introduced to trial to support the legislature's determination that this tool should be certified. But you were talking about two such fundamentally different things. You keep talking about the certification requirement and what I think, or at least my questions went to were the program or the service which seems to me to be the focus of the ADA. Yes, Your Honor. And one of the components of the ADA analysis is whether providing the requested accommodation would result in a fundamental alteration of the program. Right, and the program is the absentee balloting. The program, it's very odd to speak of a board certification requirement as a program. It's a process. Yes, Your Honor. But the, I guess the program is the voting program. The absentee ballot is a part of that. Service. Yes, Your Honor. And is the certification process a service? It doesn't, the analysis doesn't, looking at fundamental alteration in the context of the board certification process seems conceptually, it seems conceptually ambivalent to me. It doesn't, the fundamental, the program has to be the subject matter. Yes, Your Honor. The board process, not the board process being the program. Well, the, I guess the program is the voting program and if you want to consider the absentee ballot to be a service that's provided as part of the program, is that the premise of the? Well, that's part of it. Why is it not? I think that it can be viewed that way. I guess that when you're doing the standard ADA analysis, there's a sort of steps that you walk through and the first part, I guess, is to identify the program or service, which we're, you know, and even if we're going to, you know, consider, you know, even if we're going to like compartmentalize it into absentee voting, you still have to look at the nature of what's provided to all voters, which is a paper absentee balloting system. And I guess what's requested here is something that's not being provided to all voters. All voters don't have the use of this wizard. That's what makes it an accommodation, I would think. I mean, isn't that the analysis? Yes, Your Honor, and then you have to say, well, is this a necessary accommodation? Is this a reasonable accommodation? No, yeah, not, reasonable is. Well, necessary is also one of the criteria. I mean, if it weren't necessary, I guess it wouldn't, you know, if it wasn't really even necessary, then it wouldn't be required. It has to be both necessary and reasonable. And I mean, here it seems, I mean, Maryland's done everything it could  I mean, it's offering, it's striving to develop and offer a service that other states are not offering. And to say, because the Maryland State Elections Board isn't confident that it's secure and can offer yet that they're discriminating, I mean, that's what the district judge found. And he did not find it was secure. And the evidence doesn't support that. But nor is it reasonable to expect Maryland to come in and attack its own technology. I mean, the Maryland program requires the state board to find it secure before it's offered. That's state law. That's what, you know, that's what federal law requires. It has to be certified. There has to be confidence in the election. But isn't it your burden though, to establish your defense that this would be unreasonable? And because there are things that would happen to the program or the integrity. I see what you're, maybe you're on the horns of dilemma here but you agree that it is your burden, don't you agree? The burden is to show that once it's- It's unreasonable to accommodate. Well, the plaintiff said the burden to show that it's reasonable. And the plaintiff's evidence did not prove it was secure, that it was reasonable. And nor did they prove that it's a service that, you know- You developed the system, correct? Yes, Your Honor. Have you used it? Look, I can't, oh, I'm sorry. Have you used it? The current, it was offered- It wasn't there. Yes, Your Honor, it has been used. It wasn't a moot election or a real election? It was used in the 2012 primary election. I take that was a real one, right? Yes, Your Honor. And you certified the results? The results of the election were certified, yes, Your Honor. Within the confines of using that system, correct? Well, Your Honor, it was used for absentee ballots in the 2012 election. I'm talking about absentee ballots- Yes, Your Honor. So it was used exactly for the purpose which the plaintiff said they would like to use it for. And it was found to be integrity, met the integrity. No, Your Honor, there was no, there's been no revealed data breaches, but there's been no finding, there's been no audit and examination. There'll have to be, because of your burden. I mean, absence beats volumes, doesn't it? When it's your burden, you haven't shown that it does. Don't we have to presume? You know, the world, you know, construes by its width, but the court must construe by the law. Well, I think that based on, you know, all that we know that a presumption that there's, the fact that there's been no revealed data breach leads to a presumption that any network or system is secure. That just does not comport with what we know about data breaches and the internet. Well, what about the fact that the district court found, and I believe this was a finding of fact, that the security risks associated with the tool were limited. It's, I would imagine it'd be pretty difficult to posit that any tool has no security risks, any tool involved in the internet. But the district court found, as I read the record, that the security risks associated with this one were limited. Well, is that clear error? Yes, Your Honor. On the basis of what? Well, the evidence. The district court heard testimony on the effectiveness, accessibility, the security, and other features of the tool. And he made that finding. And if we're going to find that it's clearly erroneous, where in the record will we go for that? Well, Your Honor, there's several places in the record that deal with that issue. The plaintiff's expert, Dr. Juan Gilbert, his original opinion was based on his belief that there was no communication of the voters' choices over the internet. That was incorrect. He also admitted that he had never examined the computer code. So there are disputes about it? Well, there's no evidence on the other side, Your Honor. I mean, there's no evidence that, there was no evidence that it was secure by anyone who'd examined the source code at all. I mean, the plaintiff's experts hadn't examined the source code. The defendants didn't present an expert. The intervener's expert hadn't examined the source code. He testified in reference to, like, the National Institute of Standard Technology Standards, which advise against this sort of communication over the internet. And so the evidence at trial was very much, you know, not of the kind that would inspire confidence that one could say that it's definitely secure. The reason it hasn't been certified yet is there are these outstanding questions about the fact that these voter choices are communicated over the internet. The internet not being, you know, safe, because, I mean, data breaches, you know, I mean, I think we're all aware of that. And so the State Board is very concerned that it's, you know, technology be secure. And so for that reason, we ask the Court to reverse the decision and thank you. Thank you so much. We're gonna come down, Greek Council, and then take a brief recess.
judges: Roger L. Gregory, Allyson K. Duncan, Henry F. Floyd